UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

v.

D-3 TRISTAN MURPHY,

          Defendant.

_____ /

Criminal No. 19-cr-20492 - 3

HON.  MARK A. GOLDSMITH

## GOVERNMENT'S SENTENCING MEMORANDUM

## I.  Introduction

Defendant Tristan Murphy conspired to commit a robbery. To accomplish this, he and his co-conspirators traveled from Michigan to the Jared's jewelry store in Jacksonville Florida.  But once they arrived, the front doors of the store were locked.  Undeterred, Murphy volunteered to gain entry by way of a ruse—he would simply knock on the door and ask to use the restroom.  Once inside, he could alert and inform others.  As John Davis and Delano Ross followed Murphy into the Jared's, Murphy grabbed an employee and dragged her, while the others started to rob the store.  The police arrived and they were caught in the act of robbing a Jared's jewelry store and arrested.  Murphy knowingly joined a sophisticated and nationwide conspiracy, which is responsible for dozens of

1

robberies throughout the United States.

In the face of these facts, Murphy pleaded guilty to Count One of the Second Superseding Indictment, Conspiracy to Commit Hobbs Act Robbery, in violation of 18 U.S.C. § 1951(a).

The Probation department scored Murphy's sentencing guidelines as 41-51 months (*See* PSR ¶ 85). The parties agreed in the Rule 11 Agreement that Davis's sentence should be capped at the mid-point of the properly scored guideline range. Based upon the guidelines, Murphy's background and offense conduct, the government recommends a term of imprisonment at the mid-point, or 46 months.

## II.    Statement of Facts

Since approximately August 2018, the FBI has been investigating a string of "smash and grab" robberies at jewelry stores. During these robberies, the robbers use hand-held sledgehammers and hammers to break the jewelry stores' glass display cases or intimidate the stores' employees to unlock the display cases. The robbers then take loose diamonds, rings, jewelry, and other items of value. Over 30 such instances—all fitting similar description and *modus operandi*—have occurred in the Eastern and Western Districts of Michigan, as well as in Illinois, Indiana, Ohio, Pennsylvania, and as far away as Alabama, Florida, Louisiana, New Hampshire, and South Carolina. The investigation has revealed that many of the robberies were connected, planned, coordinated, and conducted by individuals

2

living in Detroit, Michigan.

The FBI learned that for each of these robberies, typically two groups would drive to the robbery location from Detroit in two separate vehicles, one in a "clean" vehicle that was either properly registered or lawfully rented, and one in a "burner" or stolen vehicle that could be ditched immediately after the robberies. During these robberies, one or two individuals would act as lookouts, while others would enter the store.  Once inside, the robbers used sledgehammers to break glass enclosures and then take diamonds and other jewelry. After ditching the stolen car the group would travel back to Detroit in the clean vehicle.

This pattern was, once again, followed for the robbery attempt in Jacksonville, Florida.  The robbery was planned in the Detroit-metropolitan area. Murphy and his co-conspirators left Detroit in the late evening of Sunday, June 9 or in the early morning hours of Monday, June 10, 2019. They traveled to Florida via South Carolina.  In South Carolina, Devon Newby was captured by surveillance video the morning of the robbery at a Walmart purchasing items to be used in the robbery. Their travel to South Carolina was also confirmed by items that were found during the search of the "getaway car," driven by Newby and a stolen car that was recovered by the Jacksonville, Florida police in the parking lot of Jared's Galleria of Jewelry. Both cars contained evidence linking the co-conspirators to the robbery attempt. In Newby's "getaway car," the police recovered a sales receipt from a Walmart store located in Walterboro, South

Carolina.

The robbers struck Jared's Galleria of Jewelry at approximately 6:50 PM. Although the store was open for business, the front doors to the store were locked. Devon Newby as the lookout, was in phone contact with the co-conspirators and watched as Tristan Murphy, was let into the store after he knocked and asked if he could use the restroom:



**CCTV still for Jacksonville robbery depicting Murphy
entering the store after asking to use the restroom.**

Approximately two minutes later, John Davis and Delano Ross, wearing hoods, began pulling on interior locked doors. They pulled hard enough that the doors opened.  A few seconds later, Davis can be seen on the surveillance video below, wielding a hammer as he enters the store:



**CCTV still from the Jacksonville robbery depicting Davis
holding a hammer inside the jewelry store.**

Once all three co-conspirators were inside, one of them chased after an
employee who was trying to get away and hide behind a display counter. He
grabbed the employee, knocking her over onto the floor, dragging her by her shirt
across the floor, before pulling her to her feet–forcing her to another area of the
store. Davis began unlocking the display cases with the keys he got from the
employees, after threatening to smash the glass with the hammer.

Murphy pushed an employee to the floor.  According to her victim impact
statement, he put something hard against the back of her neck:



*Murphy pushes the employee to the ground and according to witness statements, places something hard against the back of her head and neck.*

Murphy then grabbed the employee by her clothing, and began to pull her

toward him:



*Above- Murphy then grabs the employee by her clothing and pulls her closer to himself.*

But before the co-defendants could take any of the jewelry, Jacksonville County Florida Sheriff's Officers arrived on scene.  Three members of the conspiracy are arrested, Newby was arrested in Georgia after fleeing.

### III.   Procedural History

On July 9, 2019, Magistrate Judge Elizabeth Stafford authorized a criminal complaint charging 10 individuals, including Murphy, with conspiracy to commit Hobbs Act robbery. On September 4, 2019, the federal Grand Jury seated in the Eastern District of Michigan, indicted Murphy.  Murphy was charged in a First Superseding Indictment with conspiracy to commit Hobbs Act Robbery. (ECF No. 62). On September 25, 2019, Murphy was charged in a Second Superseding Indictment with conspiracy to commit Hobbs Act Robbery. (ECF No. 76).

On April 24, 2021, Murphy appeared before the Court and pleaded guilty as charged to the Second Superseding Indictment, with the benefit of a Rule 11 plea agreement.

### IV.   Sentencing Guideline Calculations and Other 3553(A) Factors

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a "sentence sufficient, but not greater than necessary." Those objectives are: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including

retribution, deterrence, incapacitation, and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need for restitution. The most relevant factors are evaluated below.

### A. The advisory guideline range

In *United States v. Rita*, 551 U.S. 338 (2007), the Supreme Court restated that the goals of the United States Sentencing Commission in formulating the Sentencing Guidelines are to carry out the objectives of 18 U.S.C. § 3553(a).  In *United States v. Gall*, 552 U.S. 38, 58 (2007), the Supreme Court held that a district court should begin sentencing proceedings by correctly calculating the guidelines. *Id.* at 49.

Probation has calculated the guideline range to be 41-51 months based on an offense level of 20, and a criminal history score of III, (PSR ¶ 84).  Murphy objects to the guideline range calculated by the Probation department.

### B. Probation has properly scored Murphy's guideline range

1. U.S.S.G § 2B3.1(b)(2)(E) is properly scored.

Probation scored offense variable U.S.S.G. § 2B3.1(b)(2)(E) as a three-level enhancement because Davis, a co-conspirator brandished a hammer during the attempted robbery in Jacksonville, Florida. (PSR ¶ 22).  Murphy claims that a

hammer is not a dangerous weapon, but rather simply a burglar's tool.

Murphy is incorrect. U.S.S.G. § 2B3.1(b)(2) provides a series of different enhancements for the use or possession of firearms or dangerous weapons. Seven levels are given for discharge of a firearm; six for "otherwise use[]" of a firearm; five for brandishing or possessing a firearm; and two for a threat of death. U.S.S.G. § 2B3.1(b)(2). There is no evidence that the robbers had firearms or made a death threat, so these provisions are inapplicable.

The only issue then is whether the three-level enhancement for "possession or brandishing" of a dangerous weapon should apply. Those provisions read:

"(E) if a dangerous weapon was brandished or possessed, increase by **3** levels." *Id.*

The application notes define some terms of art: "'dangerous weapon,' 'otherwise used,' [and] 'brandished,' . . . are defined in the Commentary to § 1B1.1 (Application Instructions)." *Id.* n.1. Application Note 2 further clarifies that even a fake weapon is a "dangerous weapon" in the meaning of the guideline. For its part, the Commentary to § 1B1.1 states:

> (C) "Brandished" with reference to a dangerous weapon (including a firearm) means that all or part of the weapon was *displayed, or the presence of the weapon was otherwise made known to another person*, *in order to intimidate that person*, regardless of whether the weapon was directly visible to that person. Accordingly, although the dangerous weapon does not have to be directly visible, the weapon must be present.
>
> (D) "Dangerous weapon" means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the

impression that the object was such an instrument (e.g. a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

In other words, a dangerous weapon is any item capable of death or a serous bodily injury.

Much of the litigation which surrounds the scoring of U.S.S.G. § 2B3.1(b)(2) for the use of hammers during a robbery focuses on whether a three-level enhancement for possession, or four-level enhancement for a dangerous weapon otherwise used is appropriate.  When perpetrators use the hammers to smash the display cases, some courts have found that a four-level enhancement is appropriate.

This conclusion is supported by the only published circuit court decision on point. *See United States v. Johnson*, 199 F.3d 123 (3d Cir. 1999). There, three individuals entered a jewelry store. *Id*. at 124. Two of the individuals used sledgehammers to smash display cases. *Id*. The third individual carried a baseball bat and threatened to hit an employee unless she put a phone down. *Id*. at 124-25. The robbers grabbed diamond rings and fled the store. *Id*. On appeal, the court had to decide whether the robbers merely "possessed or brandished" a dangerous weapon or, instead, whether they "otherwise used" a dangerous weapon. The court separately analyzed each weapon. First, the Court concluded that one of Johnson's co-defendants "otherwise used" the bat. *Id*. at 127. Then, in the portion of the opinion relevant to the inquiry before this Court, the court went on to conclude that

Johnson's use of the sledgehammer to smash the display case also implicated the "otherwise use" portion of the guidelines. The court stated:

> In addition, the District Court may enhance Johnson's sentence because he "otherwise used" a weapon, even though he did not make the explicit verbal threat, because his conduct was "equally coercive and threatening." Johnson did not merely stand at the front of the store holding the sledgehammer for some legitimate purpose. He used it to smash jewelry cases in front of customers and employees, while his co-defendant held a baseball bat aloft to "break necks" or "knock heads off." We have no doubt that the customers and employees might well have felt coerced and threatened by this conduct. And, we have no doubt at all, that it amounted to more than the mere brandishing, display or possession of a dangerous weapon.

While other courts have found that the smashing display cases with hammers or other similar weapons during a jewelry store robbery should only be scored as a three-level enhancement.  This was the conclusion reached by the Fifth Circuit in *United States v. Sanchez*, 603 F. App'x 259 (5th Cir. 2015).  The *Sanchez* court found that a utility bar, commonly referred to as a Fubar, that was used to forcible open a display case should only be scored as a three-level enhancement. *Id* at 265.

While it appears that the Sixth Circuit has not yet ruled on the issue of whether a hammer used to facilitate a robbery is a dangerous weapon, several Courts in this District have found that a hammer used during the course of a robbery is a dangerous weapon. Judge David M. Lawson recently held that only three points should be applied during the sentencing of *Kordaryl Cross*, (Case No. 14-20698). Likewise, Judge Bernard A. Friedman found that a three-level enhancement for the possession of a hammer during a jewelry store robbery was

11

appropriate in the sentencing of Jessie Riggins, (Case No. 15-20077-08).  None of the courts have found that a hammer is not a dangerous weapon.

    2.  <u>Murphy is not entitled to a reduction for failure to complete the robbery</u>

In his objections, Murphy argues that he is entitled a reduction of his guideline scoring because he did not complete the robbery.  At first, he argues for a reduction pursuant to U.S.S.G. § 2X1.1(b)(2), but later strikes the portion of his objection that refers to that specific guideline provision, leaving no basis for his objection.

Murphy pleaded guilty to knowingly joining a sophisticated conspiracy to rob jewelry stores throughout the United States.  He acknowledged, under oath, that it was his intent to become an active member of the conspiracy.  He traveled from Michigan to Florida to accomplish the intended goals of the conspiracy—stopping in South Carolina to sleep and to get supplies necessary to carry-out the robbery.

Once in the state of Florida, he and his co-conspirators waited until the appropriate time to commit the robbery.  When the time arrived, and the doors to the store were locked, it was Murphy who agreed to go inside, pretending only to need to use the restroom.   Once his co-conspirators were inside the store, Murphy sprang to action.  He began to actively participate in the robbery.  He grabbed an employee, forced her to the floor, and began to drag her.  It was only when the police arrived, that the robbers attempted to flee.  But for the police arriving on the

scene, Murphy and his co-conspirators would have completed the robbery.

If U.S.S.G. § 1X1.1 was controlling in this case—it does not apply because the parties agreed in the Rule 11 that U.S.S.G. § 2B3.1 applies in this case (ECF No.244, PageID.1310)—Murphy would still not be entitled to any reduction. The Background notes for that guideline provision states, in part:

In most prosecutions for conspiracies or attempts, the substantiative offense was substantially completed or was interrupted or prevented on the verge of completion by the intersection of law enforcement authorities or the victim. In such cases, no reduction of the offense level is warranted.

U.S.S.G. § 1X1.1 does not apply to this case, and even if it did, Murphy would not be entitled to any reduction because he was arrested while in the process of committing the robbery.

## C. Nature and circumstances of the offense, and the history and characteristics of the offender, 18 U.S.C. § 3553(a)(1)

### 1. Nature of the offense

Pursuant to Title 18 United States Code Section 1951(a) - "Hobbs Act Robbery" - it is a violation of federal law to interfere with commerce by robbery or threatened force, violence, or fear of physical injury. The Hobbs Act also punishes conspiracy and attempts to affect interstate or foreign commerce by robbery. Proof of the robbery requires a showing that the defendant unlawfully took or obtained tangible personal property from the victim's person or in his presence without the victim's consent and that the defendant used actual or threatened force, violence, or

fear of physical injury to the person or property of the victim or others accompanying the victim.  18 U.S.C. § 1951(b)(1).  Conspiracy to Commit Hobbs Act Robbery requires that the perpetrators agree that actual or threatened violence or force will be used to steal property from someone else.  By its very nature, a robbery is designed to strike fear in its victims, and then, to take advantage of that fear by stealing from them.

Here, Murphy and his co-conspirators accomplished just that.  Murphy assaulted and dragged one employee during the crime, as the two other defendants broke open the locked front-doors and ran into the store.  Another employee was pushed against one of the display cases. (see victim impact letter, submitted to the Probation Department).  A co-conspirator, Davis, armed himself with a weapon (see still photo above), to force employees to open the glass display cases, or to smash them.   One victim reported how he/she was terrified and thought he/she was going to be killed.  The effects of Murphy's conduct that day are, unfortunately, still being felt today. The victims report how they have not yet recovered from being assaulted.  They still feel terrified, and one of the victims reports that they still suffer from PTSD and has been in counseling ever since the crime. (PSR ¶ 24).

## 2.    History and characteristics

Murphy's criminal history is set out in the PSR at ¶¶ 38-54.  While the present case constitutes his first felony conviction, Murphy has had a number of

contacts with police and courts.  He was repeatedly given an opportunity to conform his behavior while being supervised on probation, only to repeatedly violate the terms of his release.   There are currently four outstanding warrants for his arrest for failure to appear for a court proceeding. (PSR ¶ ¶ 45-48).

The PSR describes in some detail his relationship with his family and health. (PSR  ¶¶ 52-62).  It is obvious that Murphy was raised in a home with an attentive mother, a schoolteacher and counselor for the Detroit Public Schools, which was free of abuse or neglect. (PSR ¶ 56).

The PSR also describes Murphy's substance abuse. (PSR ¶¶ 60-73).  This includes his daily use of marihuana, as well as his use of Percocet, Xanax, and Ecstasy.

### C.  Seriousness of the offense, promoting respect for law, and providing just punishment, 18 USC § 3553(a)(2)(A)

The advisory guidelines create a range so the courts can sentence similar defendants appropriately based upon the severity of their conduct. Past sentences, which have included incarceration in local jails and court ordered supervision has not given Murphy a respect for the law.  He has repeatedly demonstrated his lack of regard for supervising authority by absconding while on supervision.  Even worse, he has continued to commit crimes while under probationary supervision. Murphy committed the instant offense while under court ordered supervision for domestic violence and a drug offense. (PSR ¶ 42).  Based on his demonstrated lack

of respect for the law, incarceration at the mid-point of the guideline range would be a just sentence.

### D. Adequate deterrence and protecting the public from further crimes of the defendant, §3553(a)(2)(B) and (C)

Deterrence may serve to discourage others who are inclined to involve themselves in similar criminal conduct. Deterrence is also an important consideration when fashioning a sentence that will persuade a defendant away from continuing to engage in criminal behavior.

Murphy was given the opportunity to adjust his behavior while on probation on two occasions. Despite these supervisory measures imposed on him to deter his criminal conduct, Murphy still agreed to join a sophisticated conspiracy to rob jewelry stores and he traveled from Michigan to Florida to accomplish this crime. Likewise, these measures had no effect on his decision to participate in the planning and execution of a robbery in which one of the co-conspirators used a hammer to strike fear in the hearts of the employees and customers for profit. A sentence at the midpoint of the sentencing guidelines is necessary to protect the public from Murphy's criminal conduct.

## V.    Conclusion

For the reasons outlined above, the government respectfully recommends that

the Court impose a sentence at the midpoint of the guidelines.

Respectfully submitted,

SAIMA S. MOHSIN
Acting United States Attorney


_s/ Robert A. Moran_
Robert A. Moran
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9553
robert.moran@usdoj.gov
MI Bar P46346

Dated: October 12, 2021

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 12, 2012, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF, for uploading and service by electronic notice to counsel and parties authorized to receive electronically Notices of Electronic Filing.

*s/ Robert A. Moran*
Robert A. Moran
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9553
robert.moran@usdoj.gov