UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,                    Criminal No.: 19-20492

v.

                                        HON. MARK A. GOLDSMITH

D-2 KAI RIVERS,

              Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Kai Rivers played an active role in the Jared's Hobbs Act robbery conspiracy. On at least three occasions, he left the State of Michigan and traveled as far away as Kansas and South Carolina for the sole purpose of committing robbery. He intended to use surprise and fear to intimidate his victims—all to enrich himself. When he wasn't actively participating in the robberies, he was involved in their planning. Even while his coconspirators were being arrested, he encouraged others to continue to commit violent robberies.

In the face of these facts, Rivers pleaded guilty to Count One of the Third Superseding Indictment, Conspiracy to Commit Hobbs Act Robbery, in violation of 18 U.S.C. § 1951(a).

The Probation department scored Murphy's sentencing guidelines as 100-

1

125 months (*See* PSR ¶ 90). The parties agreed in the Rule 11 Plea Agreement that Rivers's sentence should be capped at the mid-point of the properly scored guideline range.   Based upon the guidelines, River's background, and offense conduct, the government recommends a term of imprisonment at the mid-point.

I.   **Statement of Facts**

Since August 2018, the FBI has been investigating a string of similar "smash and grab" style robberies at jewelry stores. During these robberies, the robbers used sledgehammers to break glass enclosures and then take diamonds and other jewelry. Over 30 such instances—all fitting similar description and *modus operandi*—have occurred since August of 2018 in the Eastern and Western Districts of Michigan, as well as Indiana, Ohio, Illinois, Pennsylvania, and as far away as Alabama and New Hampshire. The investigation showed that many of the robberies were connected and were planned and coordinated by individuals in Detroit, including Rivers.

Rivers directly participated in at least three robberies of Jared's jewelry stores: Overland Park, Kansas; Langhorne, Pennsylvania; and Columbia South Carolina.

On March 11, 2019, Rivers along with other co-conspirators robbed the Jared Jewelry store located in Overland Park, Kansas.  Rivers drove from Michigan to Kansas.  Once there, he acted as the lookout for the robbery.  Three of the

conspirators, wearing masks and armed with sledgehammers, entered the jewelry

store.



***Still image from Jared's surveillance video***

One of the conspirators told the employees that he had a gun and to lie down on the

floor. He then asked "where the big diamonds are" and when an employee pointed

out the display case, they used the sledgehammers to smash the glass of the display

case:



*Still image from Jared's surveillance video*

In addition to using the hammers to smash the display cases, the interior surveillance of the store's repair shop video depicts what appears to be store employees running just seconds ahead of one of the masked robbers who is wielding a hammer:



*Still image from Jared's surveillance video*

4

They took jewelry and loose diamonds valued in excess of $250,000 from the display cases in the store, ran to Rivers who was waiting in the parking lot acting as the lookout, and then fled back to Michigan with the stolen merchandise.

Later that same month, Rivers along with other co-conspirators robbed the Jared Jewelry store located in Langhorne, Pennsylvania. Rivers drove from Michigan to Pennsylvania. Once there, he again acted as the lookout for the robbery. Two of the conspirators, wearing masks and armed with sledgehammers, entered the jewelry store. Once inside, the interior surveillance video captures one of the robbers grabbing two customers, who appeared to have been shopping for a ring, and shoving them to the ground. The robber then violently drags them from the floor and pulls then so forcefully that the video shows their clothing being pulled up as they are being dragged. (*See* Exhibit 1, video camera 7, filed in the traditional manner).

Unfortunately, the violence got worse. The interior surveillance video of what appears to be the repair shop area of the store depicts one of the robbers assaulting two employees while wielding a hammer. (*See* Exhibit 2, video camera 2, filed in the traditional manner). As shown in the video, a male employee, wearing a lab-coat, is working in the shop, as another employee, this one female, runs into the shop and appears to hide under a desk:

5



***Still image from Jared's surveillance video***

One of Rivers's coconspirators enters the shop and steps on the head of the male

employee as he is laying prone on the floor:



***Still image from Jared's surveillance video***

Moments later, the video shows the male employee being pulled up from the floor by two of the robbers. Blood is visible in the video and on the still image, in the area of the floor where his head had been stomped. The blood is not present in the first photograph above, before the male employee was facedown and before his head is stepped on by the robber:



***Still image from Jared's surveillance video***

The video also depicts a violent assault on the female employee. She is dragged from under the desk, thrown to the floor, and repeatedly pushed by one of the coconspirators who is holding a hammer in his hand:



*Still image from Jared's surveillance video*

The video also illustrates other employees who were intimidated by the robbers:



*Still image from Jared's surveillance video*

9

The robbers then used the sledgehammers to smash the glass of the display cases:



*Still image from Jared's surveillance video*

They took jewelry and loose diamonds valued at about of $150,000 from the display cases that had been smashed in the store, returned to the parking lot where Rivers was waiting, and fled back to Michigan with the stolen merchandise.

The next month, Rivers along with other co-conspirators robbed the Jared Jewelry store located in Columbia, South Carolina. Rivers drove from Michigan to South Carolina. Once there, he, once again, acted as the lookout for the robbery.

Two of the conspirators, wearing masks and armed with sledgehammers, entered the jewelry store.  Once inside, they threatened the employees and customers with the hammers, and ordered them to get on the floor.  The two robbers used the sledgehammers to smash the glass of the display cases.  They took jewelry and loose diamonds from the display cases in the store valued in excess of $50,000 and fled in the cars waiting in the parking lot.  They returned to Michigan with the stolen merchandise.

On May 8, 2019, a smash and grab occurred at a Jared Galleria of Jewelry in Baton Rouge, Louisiana. Two robbers entered the Jared and demanded the manager open the bridal and diamond ring cases. The manager complied and opened the cases, so no show cases were smashed. The individuals took approximately $230,000 of diamonds and rings from five cases.

Following the Baton Rouge robbery, FBI agents obtained a search warrant to monitor location information for one of the conspirator's phones. By tracking that phone's location, FBI agents and local law enforcement were able to stop a smash and grab in progress in Jacksonville, Florida. Three individuals were arrested on June 11, 2019 in Jacksonville while trying to steal diamonds from Jared's there, and a fourth individual was arrested in Georgia trying to flee.

On June 18, 2019, a robbery occurred at the Jared Galleria of Jewelry located in Collierville, Tennessee. Three individuals entered the store, took

diamonds and jewelry and attempted to flee. The total amount of retail value of diamonds removed from the store combined with items recovered inside Jared's and/or disturbed within the display cases totaled $726,817.

In addition to directly committing at least three store robberies, Rivers was actively involved in planning robberies that he did not participate in himself. Rivers's own text messages show that less than two weeks after being discharged from parole, he was proactively searching for a "stoley," which is what the group calls stolen cars to be used in one of the robberies:

| # | Folder | Party | Time | All timestamps | Status | Message |
|---|--------|-------|------|----------------|--------|---------|
| 1 | Sent | From +13139925534 To +13136539566 Maine* Direction: Outgoing | 2/5/2019 2:07:40 PM(UTC-5) | | Sent | Stoley sumthing that can go 8hrs away |
| 2 | Sent | From +13139925534 To +13136539566 Maine* Direction: Outgoing | 2/5/2019 2:07:24 PM(UTC-5) | | Sent | Who got car |

***Rivers's text messages from February 5, 2019***

The day after River sent this text message, the Jared's jewelry store was robbed in Chattanooga, Tennessee.

But Rivers's involvement in the conspiracy does not end with him participating, or planning them, he also encourages others not to stop the robberies despite arrests being made by police.  Rivers used the Instagram username "doitfor_diamond."  The profile picture for that account is a picture of Rivers:



Only four days after co-conspirators were arrested for the attempted Jacksonville robbery, Rivers, using the Instagram account "doitfor_diamond," and reposted the below message, originally posted by "theonlyjolly." The post referenced "losing soldiers," but stated that "y'all can't count us out #teambag.":



*Posted on or about June 15, 2019, by "doitfor_diamond."*

Just three days later, three co-conspirators were arrested attempting to rob the Jared's jewelry store in Collierville, Tennessee.

14

## II.   __Procedural History__

On July 9, 2019, Magistrate Judge Elizabeth Stafford authorized a criminal complaint charging 10 individuals, including Rivers, with conspiracy to commit Hobbs Act robbery. On September 4, 2019, the federal Grand Jury seated in the Eastern District of Michigan, indicted Rivers.  Murphy was charged in a First Superseding Indictment with conspiracy to commit Hobbs Act Robbery. (ECF No. 62). On September 25, 2019, Murphy was charged in a Second Superseding Indictment with conspiracy to commit Hobbs Act Robbery. (ECF No. 76).  On July 21, 2021, Rivers was charged in a Third Superseding Indictment with conspiracy to commit Hobbs Act Robbery. (ECF No. 251).

On December 3,2021, Rivers appeared before the Court and pleaded guilty as charged to the Third Superseding Indictment, with the benefit of a Rule 11 plea agreement.

## II.   **Sentencing Guideline Calculations and Other 3553(A) Factors**

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a "sentence sufficient, but not greater than necessary." Those objectives are: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including

retribution, deterrence, incapacitation, and rehabilitation); (3) the kinds of

sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing

Commission policy statements; (6) the need to avoid unwarranted sentencing

disparities among defendants with similar records who have been found guilty of

similar conduct; and (7) the need for restitution. The most relevant factors are

evaluated below.

A. **The advisory guideline range**

In *United States v. Rita*, 551 U.S. 338 (2007), the Supreme Court restated

that the goals of the United States Sentencing Commission in formulating the

Sentencing Guidelines are to carry out the objectives of 18 U.S.C. § 3553(a).  In

*United States v. Gall*, 552 U.S. 38, 58 (2007), the Supreme Court held that a

district court should begin sentencing proceedings by correctly calculating the

guidelines. *Id.* at 49.

Probation has calculated the guideline range to be 100-125 months based on

an offense level of 27, and a criminal history score of IV, (PSR ¶ 90).  Rivers objects

to the guideline range calculated by the Probation department.

1.  Probation properly scored USSG § 2B3.1(b)(3)(A).

Rivers objects to the application of this guideline provision, claiming that

under U.S.S.G. § 1B1.3(a)(1)(B)(iii), the injury suffered by a victim during the

Langhorne, Pennsylvania robbery was not foreseeable.

16

But Rivers ignores application note "D" from this section which directly addresses the issue of foreseeability in robbery cases:

> Note that the criminal activity that the defendant agreed to jointly undertake, and the reasonably foreseeable conduct of others in furtherance of that criminal activity, are not necessarily identical. For example, two defendants agree to commit a robbery and, during the course of that robbery, the first defendant assaults and injures a victim. The second defendant is accountable for the assault and injury to the victim (even if the second defendant had not agreed to the assault and had cautioned the first defendant to be careful not to hurt anyone) because the assaultive conduct was within the scope of the jointly undertaken criminal activity (the robbery), was in furtherance of that criminal activity (the robbery), and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense).

Here, while we have no indication that Rivers instructed his coconspirators not to harm anyone, we do have evidence that victims suffered injuries during the course of the robbery in which Rivers has admitted to participating. Clearly, based on the application note, the assaultive conduct and the corresponding injury was foreseeable to Rivers.

Courts that have considered the issue of whether relevant conduct or violence committed by a co-defendant during the course of a robbery is foreseeable, have concluded that it is. (*See*, e.g., *United States v. Ford*, 988 F.3d 970, 974–75 (7th Cir. 2021) (codefendant's use of a firearm during attempted robbery was within scope of jointly undertaken criminal activity; conduct also was in furtherance of it, and

17

reasonably foreseeable to the defendant); *United States v. Patton*, 927 F.3d 1087, 1095–97 (10th Cir. 2019) (codefendant's shooting of an officer was within the scope of defendant's agreement to jointly undertake an armed robbery, even though defendant was arrested before it happened; shooting also was in furtherance of the robbery and reasonably foreseeable); *United States v. Cook*, 850 F.3d 328, 333 (7th Cir. 2017) (physical restraint perpetrated by codefendant was within scope of joint act of robbery; it also was in furtherance of the act and reasonably foreseeable)).

USSG § 2B3.1(b)(3)(A) was properly scored.

2.  Probation properly scored USSG § 2B3.1(b)(2)(E)

Rivers objects to the three-level enhancement under 2B3.1 for possession of a dangerous weapon.  Rivers does not dispute the fact that for all three robberies for which he is being held accountable, sledgehammers were possessed during each robbery, and they were used to smash jewelry display cases.  These facts are contained in the Rule 11 Plea agreement, and Rivers adopted them as true during his guilty plea hearing.

Rivers objects to the application of this guideline provision because the Court did not score it in a co-defendant's, Tristan Murphy, case.  While part of the conspiracy, Murphy pleaded guilty to the Jacksonville, Florida robbery.  Murphy was not involved in the Rivers's robberies.  Moreover, the facts in Murphy's case are distinguishable from the facts in the three Rivers robberies.  Unlike the

Jacksonville robbery, in each of the three Rivers's robberies, sledgehammers were brandished and were used to smash the display cases to gain access to the jewelry.

While the Sixth Circuit has not yet ruled on whether a hammer qualifies as a dangerous weapon, other Circuits which have considered the issue have held that a hammer qualifies as a dangerous weapon for purposes of sentencing guideline calculation. (*See United States v. Pope*, 554 F.3d 240, 242-43 (2d Cir. 2009) (affirming two-level enhancement for possession of a dangerous weapon, on the ground that a sledgehammer was not used or possessed as a weapon, but instead to facilitate the burglary; and *United States v. Martinez*, 1 F.4th 788, 791 (10th Cir. 2021) "Clearly, a hammer is "an instrument capable of inflicting death or serious bodily injury,"").

According to USSG §1B1.1, Application Note 1(E), a dangerous weapon is defined as "an instrument capable of inflicting death or serious bodily injury," an object that closely resembles an instrument capable of inflicting death or serious bodily injury, or the object was used in a manner that "created the impression that the object was such an instrument." Furthermore, Application Note 1(C), defines brandished as "all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person." According to the Factual Basis of the defendant's Rule 11 Plea Agreement, for

each robbery, it notes that the co-conspirators were masked and "armed with sledge-hammers". It is the government's position that the hammer, which is capable of inflicting death or serious bodily injury, was displayed and possessed to intimidate store employee(s). In this case, the coconspirators ordered store employees and customers to get on the floor and/or made threatening remarks while in possession of the sledgehammers. Additionally, the sledgehammers were also used to smash the display cases. But none of these additional facts are required for the application of this enhancement.  The enhancement is applied for simply possessing a weapon capable inflicting serious injury—a fact that Rivers agreed to in the Rule 11.

USSG § 2B3.1(b)(2)(E) was properly scored.

B. **Nature and circumstances of the offense, and the history and characteristics of the offender, 18 U.S.C. § 3553(a)(1)**

1. <u>Nature of the offense</u>

Pursuant to Title 18 United States Code Section 1951(a) - "Hobbs Act Robbery" - it is a violation of federal law to interfere with commerce by robbery or threatened force, violence, or fear of physical injury. The Hobbs Act also punishes conspiracy and attempts to affect interstate or foreign commerce by robbery.  Proof of the robbery requires a showing that the defendant unlawfully took or obtained tangible personal property from the victim's person or in his presence without the victim's consent and that the defendant used actual or threatened force, violence, or

fear of physical injury to the person or property of the victim or others accompanying the victim.  18 U.S.C. § 1951(b)(1).  Conspiracy to Commit Hobbs Act Robbery requires that the perpetrators agree that actual or threatened violence or force will be used to steal property from someone else.  By its very nature, a robbery is designed to strike fear in its victims, and then, to take advantage of that fear by stealing from them.

Here, Rivers and his co-conspirators accomplished just that.  Rivers and his coconspirators planned to storm jewelry stores during business hours carrying sledgehammers to intimidate customers and employees of the stores, and to use them to smash glass display cases.  During these robberies victims were pushed, dragged, intimidated, and assaulted to facilitate the taking of jewelry.  Put simply, Rivers profited by terrorizing others.  Worse yet, he did so repeatedly.  The offense is serious, and his conduct warrants a substantial prison sentence.

   2.  History and characteristics

Rivers's criminal history is set out in the PSR at ¶¶ 60-62.  The present case constitutes his third felony conviction.  In 2012, Rivers was placed on probation after being convicted at a trial of larceny from a person. (PSR ¶ 60).  He violated his probation twice and was charged with new criminal activity while under probationary supervision. (*Id*.).  After serving his probationary sentence, Rivers was convicted of delivery of a controlled substance in state court and was

sentenced to 21 months to 30 years in prison. (PSR ¶ 62). He was paroled in 2018 and was discharged from parole in January of 2019. (*Id*.).

Less than two weeks after he was discharged, Rivers was attempting to locate stolen cars to travel out of state to commit robbery. He was repeatedly given an opportunity to conform his behavior while being supervised on probation, only to repeatedly violate the terms of his supervision.

3. <u>Seriousness of the offense, promoting respect for law, and providing just punishment, 18 USC § 3553(a)(2)(A)</u>

The advisory guidelines create a range so the courts can sentence similar defendants appropriately based upon the severity of their conduct. Past sentences, which have included incarceration in state prison, parole, and court ordered supervision has not given Rivers a respect for the law. He has repeatedly demonstrated his lack of regard for supervising authority by violating his probation. Even worse, he committed new crimes while under probationary supervision and was actively involved in this conspiracy less than two weeks after being discharged from parole. Based on his demonstrated lack of respect for the law, incarceration at the mid-point of the guideline range would be a just sentence.

4. <u>Adequate deterrence and protecting the public from further crimes of the defendant, §3553(a)(2)(B) and (C).</u>

Deterrence may serve to discourage others who are inclined to involve themselves in similar criminal conduct. Deterrence is also an important consideration when fashioning a sentence that will persuade a defendant away from continuing to engage in criminal behavior.

Rivers was given the opportunity to adjust his behavior while on probation on two occasions and while on parole.  Rivers also served a prison sentence for drug trafficking.  Yet, incarceration and these supervisory measures imposed on him did not deter his criminal conduct in this case.  Rivers still agreed to join a sophisticated conspiracy to rob jewelry stores and he traveled from Michigan to Kansas, Pennsylvania, and South Carolina to accomplish this crime.  Likewise, these measures had no effect on his decision to participate in the planning and execution of a robbery in which coconspirators used a hammer to strike fear in the hearts of the employees and customers for profit.  A sentence at the midpoint of the sentencing guidelines is necessary to protect the public from Rivers's criminal conduct.

**IV.**   **Conclusion**

For the reasons outlined above, the government respectfully recommends that the Court impose a sentence at the midpoint of the guidelines.

Respectfully Submitted,

DAWN N. ISON
United States Attorney

*s/ Robert A. Moran*
Robert A. Moran
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9553
robert.moran@usdoj.gov
MI P46346

Dated: April 4, 2022

**<u>Certificate of Service</u>**

I hereby certify that on Monday, April 04, 2022, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF system, which

will send notification of such filing to all counsel of record.


<u>*s/ Robert A. Moran*         </u>
Robert A. Moran
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9553
robert.moran@usdoj.gov

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,                       Criminal No.: 19-20492

v.

                                     HON. MARK A. GOLDSMITH

D-2 KAI RIVERS,

              Defendant.

_____/

## GOVERNMENT'S EXHIBIT LIST

Exhibit 1:    Video from camera 7, Langhorne, PA robbery (filed in the traditional manner)

Exhibit 2:    Video from camera 2, Langhorne, PA robbery (filed in the traditional manner)